# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 18, 2007 Session

## STATE OF TENNESSEE v. DOYLE WINSLOW SMITH

**Direct Appeal from the Criminal Court for Knox County**
**No. 69075     Ray L. Jenkins, Judge**

---

**No. E2006-02642-CCA-R3-CD - Filed December 19, 2008**

---

The defendant, Doyle Winslow Smith, was convicted of three counts of rape of a child, all Class A felonies, and one count of aggravated sexual battery, a Class B felony. He was sentenced to twenty-two years on each Class A felony conviction and ten years on the Class B felony conviction. The sentences ran concurrently for a total effective sentence of twenty-two years. The defendant presents eight issues on appeal. He contends that: the evidence was insufficient; he was denied access to certain exculpatory evidence; the trial court had proper authority to appoint a special master to review evidence; the State failed to provide him with constitutionally sufficient particularization prior to trial as to the time of the alleged offenses; he received ineffective assistance of counsel; the trial court erred in instructing the jury; he was sentenced improperly; and the cumulative errors committed warrant reversal. After careful review, we reverse and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Stephen Ross Johnson,  Knoxville, Tennessee, for the appellant, Doyle Winslow Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General, and Leland Price, Robert L. Headrick, Marsha Mitchell, and William H. Wallace, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant was charged in September 1999 with six counts of rape of a child and two counts of aggravated sexual battery, allegedly occurring between November 1992 and November 1995. He was tried in October 2003. Three counts of rape of a child and one count of aggravated sexual battery were dismissed upon motion of the State following the conclusion of their proof. The defendant was convicted as charged on the remaining four counts and was sentenced in February 2004. He filed a motion for new trial in March 2004, and significant litigation followed. Due to

the litigation that followed the filing of the motion, the hearing on the motion for new trial was not held until October 3, 2006. The trial court took the motion under advisement and subsequently denied the motion by written order on November 27, 2006. This appeal followed.

After being charged via a presentment in September 1999, the defendant moved the trial court for an order requiring the prosecution to file a bill of particulars pursuant to *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). The motion specifically requested particularization of the general time of when the offenses alleged in the presentment occurred. The State responded that they could not provide particularization as to the time of the offenses beyond the general three-year time span alleged in the presentment. After the State's response, the defendant again moved the trial court to compel the prosecution to particularize the dates of the allegations in the presentment. The State did not provide any particularization until the victim testified on direct examination that the acts occurred on the day after her seventh birthday.

The defendant also filed a specific discovery request with the State for exculpatory information, specifically requesting impeachment evidence. The State filed a motion in limine with the trial court to prohibit the defense from presenting impeachment evidence against the victim concerning juvenile adjudications. A subpoena was issued to the Department of Children's Services ("DCS") for records concerning the victim to be produced at a pretrial hearing, but the Department filed a motion to quash the subpoena. In the DCS motion to quash, it cited the case of *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989 (1987), which stated a criminal defendant was "entitled to an in camera inspection" by the trial court of records maintained by the Department. If the trial court determines that the information in the record is exculpatory, the defendant would then be entitled to access to the information.

The defendant moved the trial court to perform an in-camera review for impeachment purposes pursuant to *Pennsylvania v. Ritchie*, but the trial court declined to review the information. During a hearing on the motion, the defendant specifically informed the trial court that the State had informed the defense that the victim was under the supervision of the Juvenile Court at some point in time. The defendant informed the trial court that an in-camera review was necessary in order to ascertain if the delinquent offense was subject to impeachment. The defendant specifically requested to know if the victim's adjudication was for a theft offense. As far as impeachment concerning a theft, the State responded, "that is not the situation here, your Honor." At the start of the trial, the State's attorney represented to the court that the victim "does not have a juvenile record" but stated she was currently with a foster family.

The State presented three witnesses at trial, the DCS worker involved in the case, the victim, and the pediatrician who performed an exam on the victim. The DCS worker testified that she received a call from the Knoxville Police Department on March 7, 1997. She was informed that they had received a complaint of child sexual abuse and her assistance was requested in investigating the claim. After getting approval to interview the victim, she traveled to the victim's home and interviewed her. Following the interview, she arranged for the victim to undergo a medical examination. She said that, later, she also participated in an interview with the defendant and an

officer from the Knoxville Police Department, during which the defendant acknowledged that the victim had been in his home and in the garage area of his home. During the interview, the defendant asserted his innocence and tried to change the subject of questions to the behavior of the victim and the victim's grandparents. He said that he thought the victim alleged that he abused her because she was mad at him because he made her leave his garage because she had played with the lotion in his bathroom.

The victim, seventeen years old at the time of trial, testified that she was sexually abused by the defendant when she was between the ages of seven and nine. She was raised in Knoxville by her grandparents, whom she refers to as her mother and father. She testified that the first incident occurred on the day after her seventh birthday. Her birthday is November 17, 1985, which made the offense date November 18, 1992. She said that on that day, the defendant's wife phoned her grandmother and said she had a present for the victim, which the victim went to get at the defendant's home. She recalled that while she was at the defendant's home, the defendant told her she could come into the garage for a snack. She testified that while they were looking at the snacks, the defendant picked her up and put her on the trunk of his old blue car. She said he pulled the bottom half of her outfit down, put his mouth on her vagina, and moved his tongue around before sticking his finger inside her vagina. She said he placed his penis in her vagina, which made her feel "dirty" and "nasty." She testified when the defendant stopped, they went into the bathroom in the garage and washed their hands. She did not observe any bleeding after the incident.

The victim testified that the defendant molested her again while they were sitting on the steps in his garage that lead into the kitchen. She said he told her to get the lotion in a yellow bottle from the bathroom in the garage. She said he pulled his private part out and squirted lotion in his hand and started moving his hand up and down on his private part. Then he did the same thing with her hand until "stuff came out." She said they washed their hands before the defendant's wife returned home. She recalled that they went into the den/living room thereafter and watched television.

She also testified about another occasion when the defendant was working on his truck in the garage. She said she was there, and the defendant started kissing on her neck. She said that her brother was with her that day but was playing in the backyard with the defendant's grandson. She said the defendant told her that this was their "little secret."

The victim said that the defendant raped her one more time. She testified that they were sitting on the couch in the living room. She said the defendant took her clothes off and then placed his penis in her vagina. She said that when he finished, he went to the bathroom to wash and then brought her a warm washcloth so she could wash. The defendant's wife soon came into the room, and they sat on the couch as if they had been watching television the entire time.

The victim claimed that she "tried to throw hints" during the period of sexual abuse, but "nobody could seem to get them." She said that the defendant's wife would invite her and her brother to play with the defendant's grandson, but she would "refuse to go" and lock herself in the bathroom for hours. She testified she did not report the abuse until she was eleven years old because

the defendant told her he would kill both her and her brother if she told anyone. Eventually, she told a friend at school that the defendant had raped her, and the friend took her to the principal. The principal said he did not want to know details and took her to her grandfather. Her grandfather became very upset and asked her if she was lying.

The pediatrician testified that he conducted an examination of the victim on March 12, 1997. He said that the victim told him that the defendant had vaginal intercourse and oral sex with her at the age of seven and ten. The pediatrician's written findings stated that she appeared more physically mature than an eleven-year-old female. He found that her hymen was not intact but that she had hymenal remnants present. He testified that her physical exam was consistent with the history that she had given to him and that the physical findings were consistent with the victim having been penetrated.

During cross-examination, the pediatrician testified that if the tip of the defendant's penis penetrated beyond the seven-year-old victim's labia into the vagina, it should have led to bleeding. He said it would have surprised him if there was no bleeding. He further testified that his physical findings with regard to the victim were consistent with a child of the same age, weight, and physical development who had not experienced vaginal penetration and acknowledged that a reasonable person could have doubt as to whether the victim had been vaginally penetrated. However, on redirect examination, he clarified that if a penis penetrates the hymen but does not enter the vagina, a seven-year-old may feel like and report that she had been penetrated.

The defendant's stepdaughter testified that the defendant remodeled her 1971 blue Chevrolet Malibu in 1990-1991, but any work on the car was conducted outside and not in the garage after that time. She said that while she lived with the defendant and her mother, the only vehicles parked in the garage belonged to her mother and the defendant. She said that her Malibu was always parked outside. She said that the victim visited their house "a lot," several times per week. She did not recall the defendant ever being alone with the victim and had observed no signs that he was sexually abusing the victim. She said that the victim was overweight and that the defendant could not have lifted her.

A forensic pathologist testified for the defendant as an expert in the field of anatomical pathology. He reviewed the photographs and video taken during the victim's physical examination in March 1997. He acknowledged that he had never examined the victim personally and stated that he only reviewed the photographs and video produced by the pediatrician. He said that his observations did not reflect a sexually experienced individual. He also opined that almost the entire hymen was intact rather than fragments, as testified to by the pediatrician. He further stated that there was no scarring present and that he would expect to see scarring if a penis had penetrated the "hymenal ring." His ultimate opinion was that the defendant did not place his penis into the victim's vagina, but he acknowledged that there would be no physical evidence if the penis touched only the outer fringes of the victim's sexual organs. He also said there would be no physical evidence if the defendant digitally penetrated or placed his tongue in the victim's vagina. He said that, based on the

photograph and the video, he could not give an opinion as to whether the victim had ever been vaginally penetrated.

The defendant's wife testified that the defendant drove a truck for UPS at the time of the alleged offenses . She said that the defendant worked Monday through Friday from 1:30 p.m. to 1:00 a.m. each day. She denied that they sold their home and moved to McMinn County because of the allegations. She also testified regarding an incident during which the victim, her brother, and another child started a fire with dry pine needles and the defendant had taken a cigarette lighter from them.

The defendant testified that he did not rape the victim. He said that he is now retired from UPS but testified that during his employment he worked twelve-hour days Monday through Friday and presented payroll records as verification. He testified that he did not know why the victim made the allegations against him. He acknowledged the incident during which the victim and others had started a fire in the corner of his yard. As a result of the incident, he gave the cigarette lighter to the victim's grandfather and caused her "to get a whipping." He said he had a lot of stories to tell about the victim. One such story involved him locking his garage to keep her out, but, nevertheless, he found her inside the garage bathroom when he went inside. On that occasion, he found her playing with lotion he kept in the bathroom. The defendant testified that the victim came over regularly even when she was not invited.

The defendant testified that he works on cars as a hobby and would never let anyone sit on them. He said that on one occasion, he ordered the victim to leave when he found her standing on the hood of his Cougar. However, he said he saw the victim climbing on her grandparents' car quite often. He testified that he did not have a blue car between 1992 and 1995 and that his stepdaughter's blue car was kept outside the garage. He denied that he was alone with the victim during the times of the alleged offenses. He did not allow her in the house and "kept her locked out."

The defendant said that the victim did not have a good home life. He said he saw the victim's biological mother drive up one day and saw the victim run up to her. The victim's mother got out of her car, called the victim a "little 'b'" and told her that she was there to see the victim's brother and not the victim. The victim sat in the driveway and cried.

He said he first learned of the allegations when he came home one day in 1997 and found a card from a police detective in his front door. He called the detective the next day and agreed to meet with him. He said he was stunned and speechless by the victim's allegations. He told the detective that he needed to speak with an attorney, and the detective told him he could leave. He said that the DCS worker told him that she thought he was guilty when he got up to leave. He did not hear from law enforcement for a long time after the interview and said he was very concerned about everything. However, he said the victim's family would wave to him when he saw them, and he thought that meant the victim had told the truth and that it was over. He said that he was offered early retirement and moved away from Knoxville approximately one year later but denied that he sold their home because of the allegations. He said that he was arrested in McMinn County and transported to Knox County in November 1999.

On October 2, 2003, the jury returned a verdict of guilty on three counts of rape of a child (Counts One, Two, and Five) and on one count of aggravated sexual battery (Count Seven), which were alleged to have occurred on the day following the victim's seventh birthday. The defendant was taken into custody following the verdict and has remained in custody since that time. He retained the services of new counsel prior to the motion for new trial hearing.

During the hearing on the motion for new trial, an attorney retained as an expert by the defendant testified that he was hired to render an opinion on whether trial counsel's assistance was effective. He opined that trial counsel was ineffective in three ways: (1) he "overpromised and underproduced with regard to his theory of the case"; (2) he handled the evidence available to him "less than effectively"; and (3) he handled the cross-examination of the "purported victim" without a great deal of skill. He testified that he concluded that, together, the three areas created a situation that prevented the defendant from receiving the effective assistance of counsel.

Trial counsel testified that he did not disagree with the expert's report or testimony. He said that early in his representation of the defendant, he requested and received detailed time records covering the defendant's employment with UPS including the month of November 1992. He said that he misplaced the records in the process of changing offices or dealing with flooding. He said he again subpoenaed the records before trial but learned that UPS no longer had the detailed time records. Instead, he only received the more general payroll records that were admitted at trial. He said that he was "wedded" to the theory that the defendant could not have committed the offense in the garage as the victim claimed. He also acknowledged that the defendant had the potential to be a bad witness. He said that, without the detailed records, they could not attack the specific day the victim claimed the incident occurred. He also said that he did not adequately cross-examine the victim and that this failure caused the jury to be convinced by the absence of argument that there was no defense for the defendant. He testified that he referred the defendant's family to appellate counsel because he knew he had made a mistake.

During cross-examination, trial counsel testified that the defendant's work records from UPS were "probably sufficiently detailed" that they would have shown whether and what hours the defendant worked on November 18, 1992. He said that not having the dates hindered their ability to present their alibi defense. He testified that he was paid $50,000 to represent the defendant and spent more than a thousand hours on the case. He retained a psychologist to help him select the jury and said that he retained a medical expert whose testimony led the State's witness to modify his medical conclusions to a certain degree. He said that the defendant elected to testify even though his defense team recommended that the defendant not testify.

At the motion for new trial hearing, the Knox County Circuit Court Clerk presented the victim's juvenile court record and counsel for DCS presented the victim's DCS records. The DCS counsel testified that the only delinquency adjudication in Knox County was for joyriding in her grandparent's van.

The former Assistant District Attorney General in Knox County who prosecuted the case testified that he received the case approximately a week and a half before the trial date. He said he met with the victim and her grandparents prior to trial but said he was unable to get much information from the victim at that time. He said that it was only five days prior to trial when he learned that the victim could match the first instance of molestation to the day following her seventh birthday. He said that the victim's reluctance to discuss the events with them made it difficult to prepare for the trial. He opined that the transcripts do not do justice to the impact her testimony had on the jury at trial. He said her testimony was both emotional and difficult for him and that he had to constantly move between the defendant and the victim to shield her from the defendant's eyes.

Analysis

The defendant challenges the sufficiency of the evidence with regard to his rape of a child convictions. Specifically, he contends there was insufficient evidence produced to establish that there was sexual penetration. However, the victim testified that, on November 18, 1992, the day following her seventh birthday, the defendant picked her up and removed the bottom of her outfit. She further testified that the defendant put "his mouth on her private part" and digitally penetrated her private part. She also said that he inserted his penis into her private part on that day. The record reflects that the State's election of offenses included digital penetration in Count Two and oral penetration in Count Three. Count One was related to vaginal penetration of the victim.

After viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State, the relevant question for this court is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). Questions concerning the credibility of witnesses and the weight and value of evidence, as well as all factual issues raised by the evidence, are for the jury to resolve as trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). This court may not re-weigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978).

The State contends that the defendant's objections go to the weight and credibility of the evidence and not to its legal sufficiency. We agree. The victim testified that the defendant performed oral sex on her and digitally penetrated her genital area, and this was sufficient for the jury to convict the defendant on Counts Two and Three. The jury verdict resolves the issue of credibility in favor of the victim. The defendant has not demonstrated that the facts were insufficient to support this finding.

With regard to Count One, the victim testified that the defendant penetrated her with his penis. The defendant contends that the medical evidence presented at trial was inconclusive as to whether the victim's vaginal examination was consistent with penile penetration. However, the pediatrician who testified during the prosecution's case in chief opined that the physical findings were consistent with a history of penetration, although, on cross-examination, he acknowledged that

the physical findings could be interpreted as to doubt whether the victim had been penetrated. Although the medical evidence is somewhat conflicting, the jury heard the evidence presented by both the defendant and the State. Any conflicts in the testimony presented at trial were to be resolved by the jury, and we will not revisit their determinations. Thus, we conclude, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992).

Next, the defendant argues that he is entitled to reversal and a new trial due to the discovery of exculpatory evidence. Specifically, he asserts that the State failed to disclose impeachment evidence concerning the victim's juvenile record, her "impaired capacity" due to her prescribed use of certain psychotropic drugs, and her prior claim against her grandfather of physical abuse. This evidence was discovered following the appointment of the defendant's expert as special master to review, in camera, certain confidential records concerning the victim. The State argues that the evidence is not exculpatory and, therefore, is not a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Initially, we note that the defendant's argument regarding the victim's alleged "impaired capacity" is without merit. The victim was taking medication for conduct disorder. There is no evidence to demonstrate that the victim's medical records were material. The defendant has not demonstrated that the victim was taking the medication at the time of the trial so it is not clear from the record before us that the victim's use of medication would have been available as impeachment material. This issue is without merit.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence "favorable to an accused" includes evidence deemed to be exculpatory in nature, evidence that could be used to impeach the State's witnesses, and evidence that could mitigate the defendant's sentence. *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001); *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *see also United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375 (1985). In this case, the defendant claims that impeachment evidence, which constitutes newly discovered evidence, was not disclosed and entitles him to a new trial under *State v. Goswick*, 656 S.W.2d 355 (Tenn. 1983).

Exculpatory evidence not disclosed to the defense is material and warrants a new trial when "there is a reasonable probability that the result of the proceeding would have been different had the exculpatory evidence been disclosed." *Sample v. State*, 82 S.W.3d 267, 270 (Tenn. 2002). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Spurlock*, 874 S.W.2d 602, 619 (Tenn. Crim. App. 1993). The alleged exculpatory evidence here pertains largely to the victim's juvenile record consisting of joyriding offenses. The defendant submits that the victim had a juvenile court record that involved multiple occurrences of theft. Under *Brady*, the State has a constitutional obligation to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or potential punishment. The court in *Brady* determined that it was a violation of due process for the State to suppress evidence favorable to the accused.

*Brady*, 373 U.S. at 87, 83 S. Ct. at 1196.  The Supreme Court of the United States extended the rule in *Brady* to impeachment evidence that would be admissible to challenge the credibility of a witness. *United States v. Giglio*, 405 U.S. 150, 154, 92 S. Ct. 763 (1972).

In order to establish a *Brady* violation, the defendant must prove each of the following four factors by a preponderance of the evidence:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389-90 (Tenn. 1995).

Prior to trial, counsel for the defendant requested that the court review the DCS records regarding the victim in order to reveal any exculpatory evidence.  The trial court stated that under *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989 (1987), the defendant needed to be specific on which records he wanted reviewed.  The State did not object to the trial court conducting an in-camera review so long as the defendant established what exculpatory evidence might be located in the State records.  The defendant then filed a motion for the trial court to review the records.  The trial court later determined that the defendant's pleadings did not sufficiently allege a basis for an in-camera review of the records under *Ritchie*.  The trial court stated that it would not review the records unless the defendant was more specific about what he was looking for and denied his request to review the DCS records in-camera.

Here, the trial court appears to have abused its discretion in declining to review the records in camera following the defendant's request.  The court in *Ritchie* stated that the defendant's interest and the State's interest in ensuring a fair trial can be protected fully by requiring that the [DCS] files be submitted only to the trial court for an in-camera review. *Pennsylvania v. Ritchie*, 480 U.S. at 60, 107 S. Ct. at 1002.  The court went on to state that the in-camera review could deny the defendant the benefits of an "advocate's eye" but would still serve to protect the State's interest.  The court also said that if the defendant was aware of specific information contained in the records, the defendant is free to request that information.  Here, the defendant was not aware of anything specific but did specifically request information regarding the victim's juvenile record, specifically her criminal background.  Our review reflects that a *Brady* violation occurred here when the trial court denied the defendant access to that information.  (1) The record establishes that the defendant requested the information; (2) the State suppressed the information; (3) the information was favorable to the accused because it could have served as impeachment evidence regarding the victim's credibility; and (4) the information was material because it could serve to impeach the credibility of the victim.  Because the defendant has established there was a *Brady* violation, he is entitled to the requested relief.

Additionally, the defendant argues that records containing a prior claim of abuse by the victim against her grandfather should have been disclosed. The record contains a report that the victim had a bruise on her right breast. The victim told DCS that the bruise was the result of her grandfather hitting her. She stated that he tried to hit her arm but she moved to block him and he hit her in the right breast instead. She also reported physical abuse on a different occasion, but DCS found the allegations were not credible. The State agrees that these records would have been admissible as prior statements by the victim pursuant to Tennessee Rule of Evidence 613.

Next, the defendant argues that his retained expert during trial could have been appointed as a special master post-trial to review the victim's records to discover exculpatory evidence. The State argues, and we agree, that there is no available relief for this as we have determined that the defendant is entitled to relief due to the State's failure to disclose information to the defendant regarding the victim's juvenile record. The trial court declined to review the material reviewed by the special master, but we have reviewed that material and granted relief to the defendant. Accordingly, when the case returns to the trial court on remand, it will not be necessary for a special master to be appointed or reinstated because the trial court will have the responsibility of performing an in-camera review of the exculpatory evidence contained in the victim's juvenile record. Therefore, this issue is rendered moot.

Next, the defendant argues that the State failed to sufficiently apprize him prior to trial of the date of his offense once the State became aware of it. In the presentment, the offenses were alleged to have occurred between November 1992 and November 1995. The defendant filed a bill of particulars and a motion to compel the State to provide more specific dates, and the trial court granted the defendant's motion for bill of particulars. For the first time, the victim testified during the trial that the initial instance of abuse occurred specifically on the day following her seventh birthday, November 18, 1992. The State elected to go forward on the three counts of sexual abuse that occurred on that date. During the hearing on the motion for new trial, the State's attorney testified that he had difficulty in getting information from the victim regarding this case because she was reluctant to open up to him about the facts of the case, but he said that he learned about the specific date of the three incidents about five days prior to trial. He further testified that he did not notify the defendant when he became aware of the specific date.

The defendant cites to the Tennessee Supreme Court case of *State v. Byrd,* 820 S.W.2d 739 (Tenn. 1991), to support his argument that the State failed to sufficiently apprise him of information about the time the alleged acts occurred. The court in *Byrd* held that "[a] conviction must be reversed if trial testimony establishes that the state had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant." *Byrd,* 820 S.W.2d at 742. The opinion in *Byrd* states that a conviction without specificity could be affirmed, however, "if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity." *Id.* The State argues that the defendant's defense would not have been hampered by the lack of a specific date because counsel lost some of the alibi records upon which they would have relied. The State further argues that the defendant was not prevented from putting on an alibi

defense with the records he had after the testimony was entered and, therefore, was not prejudiced.

Our review reflects that the defendant requested on multiple occasions the specific times that the events were alleged to occur and was denied each time because the state did not have the information about a specific date. The court in *Byrd* provided an example that is particularly relevant in the underlying case stating, "[f]or example, in a child sexual abuse case involving a victim too young to give exact dates, the child might be able to define the time of the offense by reference to such memorable occasions in a child's life as birthdays . . ." *Id*. The victim here was able to recall prior to trial that the events occurred on the day following her seventh birthday or November 18, 1992. This information is exactly the specification that the defendant had requested during the years leading up to trial, and the state simply withheld that information from the defendant. Based upon *Byrd*, we must reverse the conviction if the testimony established that the state withheld information from the defendant that would help to pinpoint the time of the offense. Here, the State did not reveal the information despite having that knowledge at least five days prior to trial. We conclude that a new trial is warranted because the State's failure to provide this information prejudiced the defendant by hampering the preparation of his defense and resulted in surprise at trial.

Next, the defendant argues that he received ineffective assistance of counsel prior to and during his trial. In order to obtain relief, the defendant must prove that trial counsel rendered deficient performance and that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052 (1984). To establish prejudice, the defendant must show that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. at 694, 104 S. Ct. at 2068.

To prove ineffective assistance of counsel, the defendant must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases," *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), or, rather, that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064; *see also Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Any fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Counsel's performance must be viewed within the context of the case as a whole, taking into account all relevant circumstances and evaluating the attorney's allegedly deficient conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066. "When assessing an attorney's performance it is not this court's function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by 20-20 hindsight." *Henley*, 960 S.W.2d at 579 (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

-11-

Here, the defendant specifically argues that trial counsel rendered ineffective assistance of counsel because counsel failed to: (1) deliver on his promises made during opening statements; (2) conduct a sufficient pretrial investigation; (3) secure the admission of certain evidence; and (4) consult with and present the testimony of a medical expert sufficiently qualified in child sexual abuse. Moreover, he contends that the cumulative effect of these errors constituted ineffective assistance of counsel and prejudiced his defense.

First, the defendant contends that trial counsel's theory of defense at trial was a defense of factual impossibility. During his opening statement, counsel told the jury that they would hear expert medical testimony which would show that the crimes did not occur. The defendant argues that during the course of trial, counsel failed to present evidence to support his opening statement and, further, that this failure was a result of trial counsel's inadequate preparation for trial. The defendant argues that counsel's inability to deliver on his opening statement was the direct result of his failure to conduct an appropriately thorough pretrial investigation.

The defendant contends that counsel was also ineffective in his preparation when he lost the defendant's detailed time employment records. The records covered the entirety of the time period alleged in the presentment, and counsel failed to replace the records after they were lost. He testified that he requested additional records from the defendant's employer but only received less specific payroll records for that period of time. Counsel testified that based on his recollection, the lost records were probably sufficiently detailed to show whether and what hours the defendant worked on the date in question.

The State argues that the defendant has not provided clear and convincing evidence that counsel rendered deficient performance in regard to the records nor has he demonstrated prejudice under *Strickland*. Our review reveals a different outcome. Trial counsel represented the defendant shortly after the return of the presentment in 1999. After he lost the detailed records, he did not seek to replace them until shortly before trial, at which time he could not obtain the complete records but only a statement regarding payment records. The defendant argues that counsel's deficient performance was evident by his failure to reacquire the records sooner and resulted in prejudice at trial. We agree that counsel losing the records amounts to deficient performance and that the potential exists that the defendant was prejudiced at trial by not having the detailed records to present as evidence. Unfortunately, we do not know what those records said. The possibility exists that the records could reflect that the defendant was working on the date in question and was physically unable to have been present as the victim claimed. However, the records could also show that the defendant was not working on the date in question or that he was home from work early on that day. We simply do not know the content of those records.

However, we do know that the State was able to argue at trial that the defendant had several years to obtain the records and that he did not have them at trial. The fact that he did not have the records was used against him, and, therefore, we conclude that he was prejudiced by trial counsel's failure to maintain or reproduce the records in question and that he is entitled to relief on this issue.

-12-

Next, the defendant argues that counsel was ineffective by failing to consult with and present the testimony of a medical expert sufficiently qualified in child sexual abuse. Specifically, he contends that counsel did not adequately familiarize himself with the expert he presented at trial. During his opening statement, trial counsel told the jury that they would hear a specific type of medical evidence and other testimony that would demonstrate that the crimes did not happen. However, at trial, the State successfully impeached the defendant's expert as an expert in pathology rather than anatomy, based upon his misrepresentation of his qualifications. The defendant's expert reviewed the photographs and video recordings taken when the victim first reported the offense and concluded that the victim had not been penetrated. As a result of his conclusion, the State's expert modified his conclusion. We conclude that trial counsel was not deficient in his selection of an expert witness. While the impeachment of the witness might have been prejudicial in some way to the jury, it was not deficient performance for trial counsel to have selected the expert as a witness. To succeed on the claim of ineffective assistance of counsel, both prongs must be met.

Next, the defendant argues that the jury instructions were misleading. Specifically, he contends that the jury should have been provided a list of lesser included offenses for aggravated sexual battery immediately following the charge. He submits that no instructions were given regarding lesser included offenses particular to Count Seven, aggravated sexual battery. He argues that the jury was immediately instructed on the elements of aggravated sexual battery followed by the lesser included offenses of rape of a child, which includes aggravated sexual battery.

Our review of the record reflects that the trial court instructed the jury on the charges in the presentment; rape of a child in Counts One, Two, and Five; and aggravated sexual battery in Count Seven. The trial court gave instructions on attempted rape of a child, aggravated sexual battery, child abuse, and assault as lesser-included offenses for rape of a child. The record does not demonstrate that the trial court gave specific instructions as to lesser included offenses for aggravated sexual battery. The record shows that the defendant neither made a contemporaneous objection to the jury instructions given nor did he file a written request for the instructions as required by Tennessee Code Annotated § 40-18-110(c).

Our supreme court has previously held, in *State v. Page*, 184 S.W.3d 223 (Tenn. 2006), that an objection to the omission of a jury instruction on an applicable lesser included offense that was not properly requested under Tennessee Code Annotated section 40-18-110(c) may only be considered by a reviewing court under the plain error doctrine if the following factors are established:

(a)     The record must clearly establish what occurred in the trial court;
(b)     A clear and unequivocal rule of law must have been breached;
(c)     A substantial right of the accused must have been adversely affected;
(d)     The accused did not waive the issue for tactical reasons; and
(e)     Consideration of the error is "necessary to do substantial justice."

-13-

*Page*, 184 S.W.3d at 230-31 (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)). The State argues that the factors do not weigh in favor of plain error because, in light of the proof presented, even if the jury had been instructed on lesser included offenses of aggravated sexual battery, it would not have impacted the outcome on Count Seven. We agree because our review reflects that it was error not to instruct the jury on the lesser included offenses of aggravated sexual battery; however, that error was harmless as the evidence, specifically the victim's testimony, established aggravated sexual battery. Aggravated sexual battery is defined as unlawful sexual contact with a victim under the age of thirteen. T.C.A. § 39-13-504(a)(4) (2003). Sexual contact "includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A.. § 39-13-501 (2003). The victim's testimony that the defendant pressed her into touching his "private part" with lotion until "yellow stuff came out" was sufficient to establish aggravated sexual battery. The victim was under the age of thirteen at the time of the incident, and the defendant caused her to touch his intimate parts for the purpose of sexual arousal. The defendant is not entitled to any relief on this issue.

Next, the defendant argues that he was sentenced improperly pursuant to *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). He contends that the trial court's fact finding utilized before enhancing the defendant's sentences above the presumptive sentences of twenty years and eight years, respectfully, deprived him of his Sixth Amendment right to a jury trial, and he argues that his sentences should be reduced to twenty years and eight years. *Blakely* had not been decided at the time of the defendant's sentencing hearing, but the State asserts that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), had been decided and that the defendant should have objected to the fact findings of the trial court in order to preserve his Sixth Amendment claim. The State correctly contends that the issue is waived and that the defendant is only entitled to relief if the error was plain error.

The defendant was classified as a Range I, standard offender, and his sentencing range for the Class A felonies was fifteen to twenty-five years. His sentencing range for the Class B felony was eight to twelve years. The presumptive sentence for a Range I, standard offender at the time was twenty years for a Class A felony and eight years for a Class B felony. T.C.A. § 40-35-112(a)(2) (2003). The trial court increased the presumptive sentences after finding three enhancement factors applicable: (4) a victim of the offense was particularly vulnerable because of age or physical or mental disability; (7) the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; and (14) the defendant abused a position of public or private trust. *See* T.C.A. § 40-35-114(4), (7), (14) (2005).

The Supreme Court in *Apprendi* held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362. In *Blakely*, the Supreme Court emphasized that the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant statutory maximum is not the maximum

sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment and the judge has exceeded his proper authority. *Blakely*, 542 U.S. at 303-04, 124 S. Ct. at 2537. Accordingly, the trial court's enhancement of the defendant's sentences was in error. However, this error is rendered moot on the basis of the remand for new trial.

The defendant's final issue on appeal is his assertion that the cumulative effect of the errors deprived him of a fair trial. Based on our conclusion that he is entitled to a new trial, we decline to review the effect of the cumulative error.

Conclusion

Based on the foregoing and the record as a whole, we reverse and remand for a new trial.

 

 

_____
JOHN EVERETT WILLIAMS, JUDGE